# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| MATILDA HOLSTON, | ) | CASE NO. 1:20-CV-1001 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Matilda Holston, ("Plaintiff" or "Holston"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her applications for a Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

# I.  PROCEDURAL HISTORY

In September 2017, Holston filed an application for DIB, alleging a disability onset date of January 11, 2016 and claiming she was disabled due to a herniated disc, lumbar sprain, and vitiligo. (Transcript ("Tr.") at 183, 217.)  The application was denied initially and upon reconsideration, and Holston requested a hearing before an administrative law judge ("ALJ").  (Tr. 121-22.)

On April 4, 2019, an ALJ held a hearing, during which Holston, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.* at 30-55.)  On May 8, 2019, the ALJ issued a written decision finding Holston was not disabled.  (*Id.* at 12-24.)  The ALJ' s decision became final on March 11, 2020, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On May 8, 2020, Holston filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 17, 18, 19.) Holston asserts the following assignments of error:

(1)    The ALJ committed harmful error when he failed to properly evaluate the evidence in this matter and found the opinions of the treating physicians not persuasive.

(2)    The ALJ committed harmful error in his determination regarding credibility as it was not supported by substantial evidence and violated Social Security Ruling 16-3p.

(3)    The ALJ committed harmful error when he found that Plaintiff could still perform her past work as a dental assistant.

(Doc. No. 17 at 1.)

# II.  EVIDENCE

## A.    Personal and Vocational Evidence

Holston was born in 1962 and was a person of either closely approaching advanced age or advanced age under social security regulations at all relevant times.  (Tr. 183.)  *See* 20 C.F.R. §§

2

404.1563 & 416.963.  She has a college education and is able to communicate in English.  (*Id.*)  She has past relevant work as a dental assistant and registered nurse.  (*Id.* at 50.)

**B.    Relevant Medical Evidence[2] - Physical Impairments[3]**

On January 12, 2016, Holston was treated by Scott L. Massien, M.D., for ongoing low back pain and sciatica down her right leg.  (*Id.* at 314.)  She reported that her employer could no longer accommodate light duty work, so she had stopped working the day prior. (*Id.*) Dr. Massien's examination notes show Holston had lumbar spasm and a stiff gait, no acute distress, no edema, and 5/5 strength in both legs.  (*Id.*)  Dr. Massien diagnosed Holston with lumbar sprain and stated he was going to submit a form to workers compensation to have Holston attend physical therapy and obtain an MRI.  (*Id.*)  He limited her to lifting twenty-five pounds; no bending, squatting, twisting, or climbing; walking 2 hours with breaks; standing 1-2 hours with breaks; and sitting 4-6 hours with breaks. (*Id.*.)

From January 11, 2016 to September 2016, Holston had monthly appointments with Dr. Massien as part of her worker's compensation claim.  (*Id.* at 317-19, 602-07.)  At each appointment, Dr. Massien provided statements continuing work restrictions from his January 12, 2016 examination with small variations.[4]

---

[2]    The Court's recitation of the medical evidence is not intended to be exhaustive and is  limited to the evidence cited in the parties' Briefs.

[3]    There are no mental impairments at issue in this case, so the Court's recitation of the evidence is limited to Holston's physical impairments.

[4]    For example, on February 12, 2016, Dr. Massien modified his previous opinion by opining Holston could do "up to 25 lbs of pushing and pulling occasionally, 10 lbs of lifting occasionally." (Tr. 318.)  On March 11, 2016, he limited her to "semi-sedentary based work." (*Id.* at 319).  Similar restriction were noted in treatment records from April 29, 2016 (*Id.* at 602), May 27, 2016 (*Id.* at 603), and June 30, 2016 (*Id.* at 604). In August 12, 2016, Dr. Massien increased her lifting

3

On February 11, 2016, an MRI of Holston's lumbar spine showed a transitional L5 lumbosacral vertebral body and multilevel lumbar spondylosis with varying degrees of central canal and neuroforaminal narrowing. (*Id.* at 279-80, 341-42.)

On February 8, 2016, Holston began physical therapy, and she continued therapy for approximately 21 sessions between February and June 2016. (*Id.* at 320-34, 438-66.) Treatment records reflect that Holston regularly performed her home exercises and demonstrated significant improvement in lumbar strength, flexibility, and functioning. (*Id.* at 325, 327, 333, 448, 450, 452, 456, 458.)

On March 11, 2016, Holston attended a follow-up with Dr. Massien. (*Id.* at 319.) She reported using Aleve and Motrin with variable success. (*Id.*) She also used lidocaine patches with some benefit but had stopped using them after that they caused heart palpitations. (*Id.*) Examination findings remained similar to January 2016, except Dr. Massien also found that Plaintiff had discomfort with straight leg raise testing in the right leg at 60 degrees. (*Id.*) He diagnosed lumbar sprain with sciatica with an MRI disclosing a L3/L4 disc herniation with rightward predominance causing severe right neural foraminal compression. (*Id.*) Dr. Massien recommended injection therapy with pain management, along with more physical therapy. (*Id.*) He noted he had recommended pain management but that request was denied by the insurer. (*Id.*)

On May 27, 2016, Holston returned to Dr. Massien and reported that she continued to make slow progress with physical therapy, but she had ongoing discomfort with weakness and sciatica

to 20 pounds and "occasional bend, squat, and twist; and added the restrictions "reaching above her shoulder occasional" and "typing frequent." (*Id.* at 606.) Similar restrictions were noted in September 15, 2016 (*Id.* at 607), October 14, 2016 (*Id.* at 588), and December 14, 2016 (*Id.* at 590).

down the right leg.  (*Id.* at 603.)  On examination, Holston's lumbar spasm persisted especially on the right; she had a stiff gait; strength was 5/5 in her bilateral legs; she was in no acute distress; and she was neurologically intact.  (*Id.*)  Dr. Massien again noted he wanted Holston to see pain management and get an epidural injection but that he was unable to get her approved for that type of treatment.  (*Id.*)

On June 29, 2016, Holston was discharged from physical therapy.  (*Id.* at 466.)  Therapists Ryan Supler, DPT and Kristen Mackness, LPTA, noted that Holston had been "progressing slowly but steadily along a therapy regimen."  (*Id.* at 464-66.)  Holston had seen at least a 75% improvement in her symptoms, and had made at least 75% progress towards all goals, including reporting at least a 50 percent decrease in pain and symptoms, for an improved ability to sleep at night; improved lumbar active range of motion; increased lower extremity strength to 5/5 in all muscles; decreased hamstring tightness; and an improved ability to lift items and return to work.  (*Id.* at 466.)  The therapists noted Holston's therapy was ending because the worker's compensation insurance would not authorize further appointment, but expressed confidence "she is ready to continue her program independently."  (*Id.*)

On June 30, 2016 Dr. Massien prescribed a prednisone taper for Holston, noting he wanted her to see pain management because "a few blocks" might give her the relief she needed to make further progress in physical therapy and return to work, but could not get insurance approval.  (*Id.* at 604.)

On July 28, 2016, Holston returned to see Dr. Massien, and reported that her low back pain and the sciatica down her right leg had definitely improved and that her pain was at a 1-2/10.  (*Id.* at 605.)  On examination, Holston's lumbar spasm and gait had improved; she had negative straight

leg testing bilaterally; she was able to lie down and get up easily from the examination table; strength in both legs was 5/5; and she was neurologically intact. (*Id.*) Dr. Massien explained that Holston seemed ready to return to work and was clinically much better. (*Id.*)

On August 12, 2016, Holston returned to Dr. Massien, and reported worsening symptoms. (*Id.* at 606.) On examination, Holston's lumbar spasm seemed more significant than it had been at the July appointment, she had some discomfort with straight leg raise testing in her right leg at about 70 degrees, her gait was stable, strength in both legs was 5/5, and she was in no acute distress. (*Id.*) Dr. Massien prescribed Gabapentin and continued ibuprofen. (*Id.*)

On September 15, 2016, Holston reported that she never tried Gabapentin because she was afraid of side effects. (*Id.* at 607.) Dr. Massien's examination findings included stable lumbar spasm and gait, and 5/5 power in both extremities. (*Id.*) He continued to limit her to "semi-sedentary work."

On September 28, 2016, Holston attended a medical evaluation with W. Kent Soderstrom, M.D. (*Id.* at 289-96.) She reported continued pain in the middle of her low back with pressure-type pain radiating down into her right buttock, and rare shooting pain into her right lower extremity. (*Id.* at 293.) She explained that the numbness and tingling into her right lower extremity had resolved and that her low back pain was worse with prolonged sitting, standing, and walking, and improved with frequent position changes. (*Id.* at 293-94.) On examination, Holston reported tenderness at the lumbosacral junction and over the right sacroiliac joint. (*Id.* at 294.) She had a positive Patrick-Faber's test on the right, and compression provoked reports of sacroiliac joint pain. (*Id.*) She had a positive Kemp's test on the right. (*Id.*) Dr. Soderstrom noted isolated spots of reported tenderness over the mid-bellies of the right gluteus medius, gluteus minimus, and piriformis muscles,

6

palpation of which provoked pain into her right lower extremity and lower back.  (*Id.*)  Her active range of motion of the lumbar spine with lumbar flexion was to 35 degrees, extension was to 10 degrees, right lateral side bending was to 5 degrees, and left lateral side bending was to 10 degrees, although she reported pain with motion.  (*Id.*)  However, she had a normal lumbar lordosis; ambulated with no apparent gait derangement and without the use of an assistive device; was able to heel and toe walk with no apparent difficulty; did not report altered sensitivity to light touch or pin prick; straight leg raise testing did not provoke reports of pain and/or paresthesias in either lower extremity; and she sat, stood up from a seated position, and got onto the examination table with no apparent difficulty.  (*Id.*)

On  March 13, 2017, Holston began treatment with Crystal Lantz-DeGeorge, M.D. (*Id.* at 386-89, 633-35.)  Holston reported no complaints and no back pain.  (*Id.* at 386.)  On examination, she was in no acute distress, was well-appearing, was neurologically intact, had no edema and 2+ radial and deep tendon pulses bilaterally.  (*Id.* at 388.)

On November 20, 2017, Holston followed up with Dr. Lantz-DeGeorge, reporting back pain that was treated with Aleve, as needed.  (*Id.* at 382-85.) On examination, she had positive straight leg raise testing in the right lower extremity, her gait was steady and her muscle strength was 5/5 throughout.  (*Id.* at 384.)  Dr. Lantz-DeGeorge diagnosed Holston with lumbar radiculopathy, continued Aleve as needed, and referred her to pain management.  (*Id.* at 385.)

On November 21, 2017, Holston sought treatment from Jeffrey T. Hopcian, M.D.  (*Id.* at 354-60.) On examination, Holston had decreased temperature sensation in her right L5 and Sl dermatomes; her lumbar facet was tender to palpation; she had an appropriate range of motion and full strength in her upper and lower extremities; her reflexes were intact; and she was in no acute

distress.  (*Id.* at 357.)   Dr. Hopcian diagnosed lumbar radiculopathy and recommended over-the-counter medication, as well as a right L4/L5 nerve block injection.  (*Id.*)

On November 28, 2017, Holston received the recommended nerve block injection.  (*Id.* at 360.)

On January 11, 2018, Holston attended a consultative physical examination with Khalid Darr, M.D. (*Id.* at 365-72.) Holston reported low back pain that sometimes radiated.  (*Id.* at 365.) On examination, she had no evidence of paravertebral muscle spasm and there was no tenderness to percussion of the dorsolumbar spine.  (*Id.* at 367.)  Straight leg testing was normal in the sitting and supine positions.  (*Id.*)  She had normal range of motion of the dorsolumbar spine; muscle strength was 5/5 bilaterally in the upper and lower extremities; there was no evidence of atrophy; her sensory modalities were well-preserved to light touch, pinprick, and vibration; she had no objective radiculopathy down the right leg; and no tenderness, redness, warmth, swelling, fluid, laxity, or crepitus of the knees, ankles, or feet.  (*Id.*)  Holston was able to walk on the heels and toes and perform tandem gait and squat, without difficulty.  (*Id.*)  She ambulated with a normal gait that was not unsteady, lurching, or unpredictable, and appeared comfortable in the supine and sitting positions. (*Id.* at 366.) Dr. Darr noted her history of back injury while lifting a heavy patient, with complaints of pain in the lower back radiating off and on into the right leg to the big toe. (*Id.* at 365.) He opined that she could lift and carry between 25 and 30 pounds.  (*Id*.)

On March 23, 2018, Holston returned to Dr. Lantz-DeGeorge for treatment of her back pain. (*Id.* at 628.) She reported that she saw pain management but could not afford it due to having no income. (*Id*.) She reported that her epidural injection worked for only a few days. (*Id*.) On examination, Holston had positive straight leg raise testing on the right at 45, her gait was normal,

8

strength in her proximal and distal bilateral extremities was 5/5, her cranial nerves were intact, Romberg testing was negative, and she was in no acute distress. (*Id.* at 629.) Dr. Lantz-DeGeorge recommended another MRI and that Holston see a spine surgeon. (*Id.* at 630.) She continued ibuprofen as needed.  (*Id.*)

On April 20, 2018, Holston completed a Function Report.  (*Id.* at 242-245.)  She reported that she could not work as she could no longer stand for extended periods of time and had to take multiple breaks. (*Id.* at 242.)

On April 25, 2018, an MRI of Holston's lumbar spine showed lumbar spondylosis unchanged from the previous examination in February 2016. She had a mild bulging disc at L3/4 without central canal stenosis, but there was suspected bilateral nerve root compression. At L4/5, there was a bulging disc and suspected bilateral nerve root compression. Her L5/S1 disc was sacralized on the right. (*Id.* at 646-47.)

On November 26, 2018, Holston returned to Dr. Lantz-DeGeorge and reported that her that her back pain was stable, and she was attending school for education. (*Id.* at 623.) She had no complaints of weakness, numbness, or lack of coordination.  (*Id.*)  On examination, Holston was well-appearing and in no acute distress. (*Id.* at 624.) She had no extremity edema and was grossly intact neurologically. (*Id.*)

On March 6, 2019, Dr. Lantz-DeGeorge completed a Physical Medical Source Statement. (*Id.* at 651-54.) Noting she had treated Holston since January 2015, De. Lantz-DeGeorge diagnosed chronic lumbar radiculopathy with right sided leg weakness, numbness, and pain. Holston had sharp pain in her low back/right leg worse with movement. On examination, Dr. Lantz-DeGeorge found reduced strength and sensation in the right lower extremity. As a result of these findings, it was

9

opined that Holston could sit for 2 hours and stand for 5 minutes. She could stand/walk less than 2 hours per workday and sit at least 6 hours. She would need to walk around every hour for 15 minutes. In addition, she would need additional breaks every hour due to muscle weakness, pain/paresthesia, numbness, and adverse effects of medication. Plaintiff could occasionally lift less than 10 pounds, and rarely lift 10 pounds. It was opined that Plaintiff would be off task more than 25% of a workday, she was capable of low stress work, and she would miss more than four days of work per month.

**C.    State Agency Reports - Physical Impairments**

On January 27, 2018, state agency reviewing physician Dr. Mehr Siddiqui reviewed the file and opined that Holston was limited to the light level of exertion. (*Id.* at 63-64.)  Dr. Siddiqui concluded that Holstom could perform her past work as a dental assistant.  (*Id.* at 65.)

On May 30, 2018, Dr. Sreenivas Venkatachala reviewed the file at Reconsideration and concurred with Dr. Siddiqui's opinion.  (*Id.* at 121-23.)

**D.    Hearing Testimony**

During the April 4, 2019 hearing, Holston testified to the following:

- In her prior work as a dental assistant, she ordered supplies, advocated for patients, spoke with vendors, made impressions, and made appointments.  She lifted up to 40 pounds.  (Tr. 35.)

- She stood frequently, and sat in a specially designed dental assistant's chair that was raised higher off the ground than a typical chair.  (*Id.* at 36.)

- She left that job to better herself by pursuing a RN degree.  After that, she worked as an RN.  (*Id.*)

- She stopped working as an RN after she hurt her back while helping a patient off a bedside commode.  (*Id.* at 37.)

- She worked as a dental assistant for 21 years, and went back to school to receive her

RN degree while working.  After graduation, she worked as an RN for 6 years, until she got injured.  (*Id.* at 38.)

- After her injury, she received both worker's compensation and private disability insurance, but both have expired.  She cannot afford medical care, especially pain management medications, although she has insurance through her husband, who is a police officer.  A single shot of pain medication cost her $433 after insurance.  (*Id.* at 39.)

- She is currently in school pursuing a master's degree in nursing at Indiana Wesleyan University's online program, so she can become a nurse educator.  She needs to take multiple breaks when sitting at the computer, so her work takes longer to complete.  Her breaks are between 15 and 45 minutes, and she uses the time to stretch, stand, lie down, or do core exercises, as well as to distract herself from the pain.  (*Id.* at 40-1.)

- She has problems sleeping.  She has to sleep in a separate room than her husband because she is constantly moving, seeking a comfortable position for sleep.  (*Id.* at 41.)

- Her back pain is constant.  Sometimes it is more tolerable, but when it gets worse she takes prescription ibuprofen or Aleve.  (*Id.* at 42.)

- She previously took Percocet oxycodone, but it made her loopy, forgetful, and she couldn't function, so she stopped.  (*Id.* at 43.)

- When she takes her highest does of ibuprofen, she has to lie down, because it makes her sleepy.  This happens three to four times a month.  (*Id.*)

- The  highest does of ibuprofen kicks in within two hours, but then she is zonked and needs to sleep.  (*Id.* at 44.)

- The pain radiates down her right leg all the way to her right toe.  It causes her to lose her balance sometimes, but she has always caught herself when she was falling.  When she first hurt her back, she was immobile for a month and unable to walk, and then used a cane for a while.  (*Id.*)

- She has numbness and tingling in her right leg and uses railings to walk up and down stairs.  (*Id.* at 45.)

- She cooks but cannot stay on her feet for prolonged periods of time, so she does a lot of microwave foods.  She cannot vacuum, and sometimes has difficulty lifting heavy pots and pans from the dishwasher.  She does light laundry, but cannot carry things up or down stairs.  (*Id.* at 45-6.)

11

- The most she can stand at one time is half an hour.  The most she can stand, with breaks, in an eight-hour work day is 3 to 4 hours.  (*Id.* at 46.)

- She can walk about 15 minutes without needing a rest, but then she would need to sit for at least 15 minutes to recuperate.  She can sit for about 45 minutes at a time, and lift up to 20 pounds.  (*Id.* at 47.)

- She cannot stoop, but, if she needs to, will get on her hands and knees.  She also cannot hold a crouching position.  (*Id.*)

The VE testified Holston had past work as a dental assistant and registered nurse.  (*Id.* at 50.)

The ALJ then posed the following hypothetical question:

> I'm going to ask you to assume an individual who is 56 years old; has a Bachelor's degree, is working on her Master's, therefore I find she's highly literate; has work background to which you testified. This individual is limited to work of light exertion requirements, with additional non-exertional limitations, specifically no climbing of ladders, ropes, or scaffolds; and occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. I find no severe mental limitations.  Can this person perform past work?

(*Id.* at 50.)

The VE testified the hypothetical individual would be able to perform Holston's past work as a dental assistant, as it is generally performed, but not as she previously performed it.  (*Id.* at 51.) The VE further explained that a hypothetical individual who was off task at least 20% of the workday due to symptoms of medically determinable impairments could not sustain competitive employment at any level.  (*Id.*)

In response to questioning from Holston's counsel, the VE testified that an individual who could only stand or walk for two hours out of an eight-hour work day could not perform a job as a dental assistant.  (*Id.* at 52.)  If an individual had to walk every hour for 15 minutes on a constant basis, they could not sustain competitive employment at any level.  (*Id.*)  The dental assistant position as generally performed requires lifting at most 20 pounds.  (*Id.* at 53.)  An individual who

12

was regularly absent four days per month would be unable to sustain competitive employment at any level.  (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 & 404.1505(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) & 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) & 416.920(c).  A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) & 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f)

13

& 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), & 416.920(g).

Here, Holston was insured on her alleged disability onset date, January 11, 2016, and remains insured through December 31, 2021, her date last insured ("DLI.")  (Tr.18.)  Therefore, in order to be entitled to DIB, Holston must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2.  The claimant has not engaged in substantial gainful activity since January 11, 2016, the alleged onset date.

3.  The claimant has the following severe impairment: degenerative disc disease of the lumbosacral spine.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except that she cannot climb ladders, ropes, and scaffolds, and can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  The claimant does not have any mental limitations.

6.  The claimant is capable of performing past relevant work as a dental assistant.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

7.      The claimant has not been under a disability, as defined in the Social Security
        Act, from January 11, 2016, through the date of this decision.

(Tr. 18-24) (internal citations omitted).

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion

15

reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec*., 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11  13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10  cv  734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10  CV  017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09  cv  1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

16

# VI.  ANALYSIS

**A.       First Assignment of Error: Opinions of the Treating Physicians**

Holston asserts that the ALJ erred in finding the opinions of the treating physicians, Dr. Massien and Dr. Lantz-DeGeorge, "not persuasive."  (Doc. No. 17 at 12.)  She notes that the ALJ's rationale that the opinions were not consistent with each other is not logical because they were rendered three years apart, and her condition changed over time.  (*Id.* at 13.)  However, she notes that both treating physicians limited her to "sedentary work."[5]  She asserts that the ALJ erred by instead adopting the "light work"[6] restriction articulated by the consultative examining physician and the state agency reviewing physicians, whose opinions were deemed "persuasive" despite being based on a single examination or review of an incomplete record.  (*Id.*)

The Commissioner responds that Holston is inaccurately mixing the old and new standards for treatment of medical opinions.  (Doc. No. 18 at 10.)  He asserts that the ALJ appropriately weighed the opinion evidence based on the medical record as a whole, and considered multiple opinions proffered by Dr. Massien, which reflected the change in her condition over time.  (*Id.* at 10-

---

[5]       The Code of Federal Regulations defines sedentary work as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567(a).

[6]       The Code of Federal Regulations defines light work as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).

17

15.)

Since Holston's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations")  for evaluation of medical opinion evidence apply to this claim.[7]  *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 416.920c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[8] (2) consistency;[9] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.   20 C.F.R. §§

---

[7]      Holston's claim was filed in September 2017.  (Tr. 183.)

[8]      The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[9]      The Revised Regulations explain "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

416.920c(a), (c)(1)-(5).   However, supportability and consistency are the most important factors.

20 C.F.R. §§ 416.920c(a), 404.920(b)(2).

The Revised Regulations also changed the articulation required by ALJs to explain their

consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case
> records containing many types of evidence from different sources, it is not
> administratively feasible for us to articulate in each determination or decision
> how we considered all of the factors for all of the medical opinions and prior
> administrative medical findings in your case record. Instead, when a medical
> source provides multiple medical opinion(s) or prior administrative medical
> finding(s), we will articulate how we considered the medical opinions or prior
> administrative medical findings from that medical source together in a single
> analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this
> section, as appropriate. We are not required to articulate how we considered
> each medical opinion or prior administrative medical finding from one
> medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of
> this section) and consistency (paragraph (c)(2) of this section) are the most
> important factors we consider when we determine how persuasive we find a
> medical source's medical opinions or prior administrative medical findings
> to be. Therefore, we will explain how we considered the supportability and
> consistency factors for a medical source's medical opinions or prior
> administrative medical findings in your determination or decision. We may,
> but are not required to, explain how we considered the factors in paragraphs
> (c)(3) through (c)(5) of this section, as appropriate, when we articulate how
> we consider medical opinions and prior administrative medical findings in
> your case record.

> (3) Equally persuasive medical opinions or prior administrative medical
> findings about the same issue. When we find that two or more medical
> opinions or prior administrative medical findings about the same issue are
> both equally well-supported (paragraph (c)(1) of this section) and consistent
> with the record (paragraph (c)(2) of this section) but are not exactly the same,
> we will articulate how we considered the other most persuasive factors in
> paragraphs (c)(3) through (c)(5) of this section for those medical opinions or
> prior administrative medical findings in your determination or decision.

20 C.F.R. § 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.*, No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a) & (b)(1), 416.920c(a) & (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

### i.     Opinions of Dr. Massien

Holston was treated by Dr. Massien from January 16, 2016 through September 2016.  (Tr. 89.)  This treatment was related to Holston's worker's compensation claim, and therefore Dr. Massien provided multiple statements regarding work restrictions.   The ALJ discussed these opinions as follows:

> The claimant's treating provider, Dr. Massien, provided several opinions regarding the claimant's work restrictions.  From January 12, 2016 through June 20, 2016, he believed the claimant could lift and/or carry 10 pounds occasionally, push and/or pull up to 25 pounds occasionally, walk two hours with breaks, stand one to two hours with break, and sit four to six hours with breaks, and could not bend, squat, twist, or climb.   On July 28, 2016, he released the claimant to full duty without restriction beginning August 16, 2016.  However, on August 16, 2016, Dr. Massien recanted his statement from July 2016 and instead opined that the claimant could push and pull 25 pounds occasionally, lift up to 20 pounds occasionally, occasionally bend, squat, and twist, never climb, walk two to three hours with breaks, stand two hours with breaks, and sit four to six hours with breaks.   His opinion from August 2016 remained the same through February 5, 2017.[10]  The undersigned finds Dr. Massien's

---

[10]     The treatment record cited by the ALJ states that Dr. Massien is placing Holston "on work restrictions from 8/12/16 to 9/16/16." (Tr. 606.)  The record from her September 15, 2016 appointment extended these restrictions an additional month, until October 16, 2016. (Tr. 607.)  It is not clear how the ALJ determined that Dr. Massien intended the restrictions to remain for four additional months, although on other documentation, he did identify a "return to work target date" of February

work restrictions are not supported by examination findings that showed an improved, stable, normal or steady gait, improved or stable lumbar spasms, an appropriate range of motion, intact reflexes, negative straight leg raise testing bilaterally, full strength in her upper and lower extremities, 5/5 power or muscle strength both legs or throughout, and being neurologically intact. Dr. Massien's opinions are not consistent with the opinions of Dr. Lantz-DeGeorge, Dr. Darr, or the State Agency physicians.

(*Id*. at 22.) (Internal citations omitted).

The ALJ evaluated Dr. Massien's opinion using the two most important factors identified by the new regulations: supportability and consistency. The records that the ALJ cited as being in contradiction to Dr. Massien's opined limitations cover a wide range of dates, beginning with Dr. Massien's own record of treatment from July 28, 2016 through November 2018. (*Id*. at 354-60, 605-8, 623-5, 628-30.) Dr. Massien's record of treatment from July 28, 2016 documents an appointment when Holston had improved to the point the Dr. Massien perceived her to be on the verge of returning to work, and noted "she seems clinically much better. Thus, I'm going to release her to full duty w/out restrictions as of 8/15/16 & we'll follow her expectantly." (*Id*. at 605.) At that time, she reported her pain was "1-2/10" and her symptoms had been "moderate in severity over the past month." (*Id.*)

The other records cited by the ALJ also support his conclusion that Holston's symptoms did not consistently impair her functioning to the high degree opined by Dr. Massien. On March 13, 2017, Dr. Lantz-DeGeorge noted Holston reported "no back pain" and "no limb pain." (Tr. 633.) On November 20, 2017, Dr. Lantz-DeGeorge noted that Holston had a positive right straight leg raise, but steady gait, and full muscle strength throughout her body. (*Id*. at 384.) On November 21, 2017, Dr. Hopcian noted that Holston had full strength in her upper and lower extremities, no joint

---

1, 2017. (Tr. 609.)

pain, and "appropriate" range of motion.  (*Id*. at 357.)  However, he also noted decreased sensation in Holston's right L5 and S1 vertibrae, and recommended that she receive two epidural steroid injections as well as treating her pain with over the counter NSAID medication.  (*Id*.)  On November 26, 2018, Dr. Lantz-DeGeorge noted Holston presented "without complaints" and her back pain was "stable."  (*Id*. at 623.)  There is no indication she performed a straight leg test at this appointment, and no notation regarding Holston's gait.

The ALJ also found Dr. Massien's opinion inconsistent with the other opinions of record. Dr. Massien's opinions are the only ones rendered during the period from January through August 2016, and the next opinions were not rendered until January 2018.  Holston's asserts that any inconsistency is a logical result of the change in her condition over time.  However, Dr. Massien's records document Holston experienced significant improvement during the period he treated her, and at one time appeared ready to resume work without restrictions before relapsing.  Thus, even assuming, *arguendo*, that the factor of consistency is inapplicable to Dr. Massien's opinions, the factor of supportability sustains the ALJ's determination that his opinions were unpersuasive, because they did not reflect a level of impairment that was sustained over a twelve-month period, as required for a finding of disability under the regulations.

### ii.     Opinion of Dr. Lantz-DeGeorge

Holston was treated by Dr. Lantz-DeGeorge  from March 2017 through March 2019.  (Tr. 19-20.)  Dr. Lantz-DeGeorge rendered a medical opinion in March 2019,[11] which the ALJ discussed as follows:

---

[11]     Although the ALJ states the opinion was dated March 9, 2019, this appears to be a typographical error, as the opinion is dated March 6, 2019.  (Tr. 654.)

The claimant's treating provider, Dr. Lantz-DeGeorge, provided a physical medical source statement on March 9, 2019.  Dr. Lantz-DeGeorge opined that the claimant could sit up to 120 minutes at one time and stand up to five minutes at one time.  She believed the claimant could stand and walk less than two hours in an eight-hour workday and sit at least six hours total in an eight-hour workday.  She explained that the claimant would need to walk around every 60 minutes for 15 minutes each time and take unscheduled breaks hourly for 15 minutes.  Dr. Lantz-DeGeorge opined that the claimant could never lift and carry 20 pounds, rarely lift and carry 10 pounds, and occasionally lift and carry less than 10 pounds.  She believed that the claimant would be off task 25% of the workday and absent more than four days per month due to her impairments and treatment.  The undersigned rejects this opinion and finds it to be unpersuasive as it was not supported by the overall objective medical record that showed an improved, stable, normal or steady gait, improved or stable lumbar spasms, an appropriate range of motion, intact reflexes, negative straight leg raise testing bilaterally, full strength in her upper and lower extremities, 5/5 power or muscle strength both legs or throughout, and being neurologically intact.  Further, the opinion is not supported by the consultative physician examination findings discussed in greater detail above.  The opinion is mostly consistent with the claimant's testimony regarding her alleged level of limitation, but the opinion is not consistent with the opinions of Dr. Darr, Dr. Massien, or the State Agency physicians.

(Tr. 22-3) (internal citations omitted).

The ALJ analyzed Dr. Lantz-DeGeorge's opinion's supportability in relation to the same records reviewed in the analysis of Dr. Massien's opinions *supra*.  He also noted it was inconsistent with the other opinions of record, rendered in January through August 2016 and January and May 2018.  Dr. Lantz-DeGeorge's own treatment notes show that the severity of Holston's symptoms was not consistent.  On March 13, 2017, she noted Holston reported "no back pain" and "no limb pain." (Tr. 633.)  One year later, on March 23, 2018, Dr. Lantz-DeGeorge noted that Holston was positive for paresthesias but negative for weakness, with a positive straight leg raise to 45 degrees on the right.  (*Id*. at 629-30.)  Dr. Lantz-DeGeorge described Holston as "severely functionally limited due to pain."  (*Id*. at 630.)  On November 26, 2018, Holston had improved again, and presented "without complaints, back pain stable."  (*Id*. at 623.)  Dr. Lantz-DeGeorge opined that

Holston's condition was likely to produce good days and bad days, but also based her opinion in part on "reduced strength" in Holston's right leg, which is not reflected in any of the cited records.[12]  (*Id.* at 651, 654.)

The role of this Court is not to reweigh evidence, but rather to ensure that the ALJ employed the proper legal standard by considering the factors as set forth in the regulations to determine the persuasiveness of a medical opinion, and supported his conclusion with substantial evidence. *Brainard*, 889 F.2d at 681 (6th Cir. 1989).  Here, it is clear the ALJ evaluated the opinions of the treating physicians based on the most important factors of supportability and consistency, and identified substantial evidence supporting his determination they were unpersuasive.  Therefore, although others may reasonably disagree with the ALJ's conclusions, this assignment of error is without merit.

**B.      Second Assignment of Error: Credibility Determination**

Holston asserts that the  ALJ did not properly evaluate the medical evidence and make a "defensible" determination as to whether her testimony was credible.  (Doc. No. 17 at 17.)  She argues that the ALJ failed to even mention the evidence which supported her credibility in reporting her symptoms, provided an insufficient analysis, and did not comply with the requirements of SSR

---

[12]      At the time of Holston's discharge from physical therapy, on June 29, 2016, the therapist noted she was "85%" of the way towards the goal of full strength in her lower extremities.  (Tr. 466.)  However, Dr. Massien's treatment notes from a month later, on July 28, 2016, document "Power is 5/5 in both legs."  (*Id*. at 605.) Even after her symptoms worsened in August and September 2016, Dr. Massien noted she retained full strength in both legs.  (*Id*. at 606-7.)   September 28, 2016, Dr. Soderstrum noted "no muscle atrophy or asymmetry."  (*Id*. at 294.)  On March 23, 2018, Dr. Lantz-DeGeorge also noted "Strength 5/5," and described Holston's gait as "normal."  (*Id*. at 629.)  There are no records cited in Dr. Lantz-DeGeorge's treatment notes that document less than full strength in Holston's leg.

16-3p.  (*Id.* at 18.)

The Commissioner responds that the ALJ properly found Holston's subjective complaints inconsistent with the objective evidence of record.  (Doc. No. 18 at 16.)  He asserts the ALJ cited to substantial evidence supporting his decision, and the ALJ's weighing of the evidence was more through than Holston alleges.  (*Id*. at 17.)

The ALJ must evaluate an individual's statements about their symptoms on the based on their consistency with the entire case record.[13]  Determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs*., 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's findings in this area are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs*., 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms . . . and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms" SSR 16-3p, 2016 WL 1119029; *see also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

---

[13]     SSR 16-3p, which took effect on March 27, 2017, removed the term "credibility" from the analysis. Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence."  SSR 16-3p, 2016 WL 1119029 at *6. The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. § 404.1529; SSR 16-3p, Purpose, 2016 WL 1119029 (March 16, 2016).  Beyond medical evidence, there are seven factors that the ALJ should consider.[14]  The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence.  *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

In this case, the ALJ acknowledged Holston's testimony that:

> she experienced constant back pain which radiated into her right leg down to her right toes and caused weakness that affected her ability to balance.  She testified that she had difficulty climbing stairs, crouching, stooping, and bending.  The claimant felt that she could sit for half and hour to an hour before standing up to reposition herself, stand for half an hour at a time, and walk 15 minutes before needing to take a break.  She testified that she believed she could stand a total of three to four hours during a day with breaks and lift 20 pounds.  The claimant explained that her pain was five out of ten all of the time, but could be as high as ten about three to four times a month.  She further explained that she treated her worst pain symptoms with ibuprofen prescribed by her doctor, which made her sleepy.  She testified that she also treated her pain with Aleve.

(Tr. 16.)  The ALJ accommodated some of these limitations in his RFC determination.  However,

---

[14]     The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. See SSR 16-3p, 2016 WL 1119029 at * 7; *See also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732  733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

26

he found Holston's statements regarding the intensity, persistence, and limiting effects of her symptoms inconsistent with the medical evidence and other evidence of record, restricting her to light, rather than sedentary, work.  (*Id*. at 20.)

The ALJ cited the medical records discussed *supra*, including parts of the record supporting Holston's reported symptoms, such as:

- February 2016 and April 2018 MRI results showing multilevel lumbar spondylosis that was unchanged.  (*Id*. at 646-8.)

- September 28, 2016, report from the independent medical evaluation performed by Dr. Soderstrum, which describe a positive Patrick-Faber's test on the right, and reported pain on passive stretch and resist flexion of the right hip, palpitation of the gluteus muscles, and positive Kemp's test on the right.  (*Id*. at 294.)

- January and March 2016 treatment records from Dr. Massien, noting "lumbar spasms persist" and "stiff gait." (*Id*. at 314, 319.)

- May 2016 treatment records from Dr. Massien, noting "Power 5-/5 in the R leg," noting "lumbar spasms persist" and "stiff gait." (*Id*. at 603.)

- August 2016 treatment records from Dr. Massien noting "lumbar spasms more significant that it had been prior," right straight leg raise test caused "some discomfort at about 70°," but also "Power is 5/5 in both legs" and "Gait is stable." (*Id*. at 606.)

- November 2017 treatment records from Dr. Hopcian noting "decreased temp sensation in right L5 and S1, Right SI and lumbar facet ttp," and documenting administration of a lumbar transforaminal epidural.  (*Id*. at 360.)

- November 2017 treatment records from Dr. Lantz-DeGeorge, noting a positive right straight leg test and providing a referral for an MRI based on Holston's chronic radicular symptoms. (*Id*. at 384.)

- March 2018 treatment notes from Dr. Lantz-DeGeorge, noting a positive right straight leg test at 45°, but normal gait and full strength in both extremities. (*Id*. at 629.)

However, the ALJ also noted other parts of the record - including often section of the same

27

medical records cited *supra* - which were inconsistent with Holston's reported severity of symptoms, including:

- January 2016 treatment records from Dr. Massien, noting "Power 5/5 in both legs" and that Holston reports "her back is gradually improving," and was in "no acute distress." (*Id*. at 314.)

- Physical therapy records spanning February through June 2016, which reflect that Holston regularly performed her home exercises and demonstrated significant improvement in reduced pain, and increased lumbar strength, flexibility, and functioning. (*Id.* at 325, 327, 333, 448, 450, 452, 456, 458.)

- September 28, 2016, report from the independent medical evaluation performed by Dr. Soderstrum, which describe Holston as able to sit, stand up from a seated position and get on and off the examining table without difficulty; walk with no gait derangement and without use of an assistive device; was not in acute distress; and showed no muscle atrophy or asymmetry.  (*Id*. at 284.)

- November 2017 treatment records from Dr. Hopcian noting no joint pain, appropriate range of motion, and observing Holston was in no acute distress.  (*Id*. at 357.)

- November 2017 treatment records from Dr. Lantz-DeGeorge, noting "Gait steady. Muscle strength 5/5 throughout."  (*Id*. at 384.)

- November 2018 treatment records from Dr. Lantz-DeGeorge, noting Holston presented "without complaints, back pain stable" and in "no acute distress."  (*Id*. at 623.)

- March 2018 treatment records from Dr. Lantz-DeGeorge, noting "Strength 5/5" and "Gait normal."  (*Id*. at 629.)

These records span the relevant period.  They are representative of evidence that both supports and challenges the ALJ's conclusion.  The ALJ's articulation of this evidence makes clear that he  evaluated Holston's statements about her symptoms on the based on their consistency with the entire case record.  Although the ALJ did not discuss Holston's assertion that she takes breaks in order to manage her online classes, neither did he cite the online coursework as evidence of her

ability to perform light work, and thus, this omission is at most a harmless error. Nor does the ALJ discuss a number of other factors set forth in 20 C.F.R. § 404.1529(c)(3), but it is not mandatory that he include a discussion of each factor.

The ALJ's findings in this area are entitled to considerable deference. Where, as here, the ALJ makes clear that he considered a wide range of evidence covering the relevant period, and clearly articulates the basis for his decision, that decision is supported by substantial evidence and was made pursuant to proper legal standards. Therefore, this assignment of error is without merit.

**C.     Third Assignment of Error: Performance of Past Work**

Holston asserts that the ALJ erred because he failed to "build an accurate and logical bridge between the evidence documenting [her] disabling problems as set forth in the record, and the ALJ's decision that she could perform her past work as a dental assistant." (Doc. No. 17 at 15.) She reiterates her argument that the ALJ should have restricted her to a sedentary level of work, which would have resulted in a finding of disability due to her age. (*Id.* at 20.)

The Commissioner responds that this argument repackages the two previous assignment of error, because Holston relies on her subjective testimony and the treating source opinions to argue that limitations consistent with her testimony and these opinions would limit her to sedentary work. (Doc. No. 18 at 18.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 416.927(d)(3). As such, the ALJ bears the responsibility for

assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96-8p, 1996 WL 374184 (July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec*., 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him"); s*ee also* SSR 96 8p, 1996 WL 374184 at * 7 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her*, 203 F.3d at 391.

As discussed *supra*, the ALJ clearly articulated the basis for his decisions in this case, including his assessment of Holston's subjective symptoms and his weighing of the treating physicians' opinions, supported those decisions with substantial evidence and applied the proper legal standards. Therefore, he properly used those finding as the basis for his determination of Holston's RFC. It is undisputed that he presented a hypothetical based on the RFC to the VE at the hearing, and the VE testified that a hypothetical individual with those limitations could perform Holston's past work as a dental assistant, as it is generally performed, although not as she previously

performed it. (Tr. 51.) Therefore, this assignment of error is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final

decision be AFFIRMED.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: April 20, 2021

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**